IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CYNTHIA MOKRY,                          )
                                        )     Case No. 07 C 0972
                    Plaintiff,          )
                                        )     Judge Virginia M. Kendall
        v.                              )
                                        )
PARTYLITE WORLDWIDE, INC.,              )
                                        )
                    Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff Cynthia Mokry ("Mokry") sued her employer, Defendant PartyLite Worldwide, Inc.

("PartyLite"), alleging various acts of employment discrimination under Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981,

and the Age Discrimination and Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*

Mokry claims that PartyLite failed to promote her and took disciplinary action against her based

upon her race, national origin, gender and age. Additionally, she claims that PartyLite created a

hostile work environment and retaliated against her. PartyLite now moves for summary judgment.

For the reasons stated, PartyLite's Motion for Summary Judgment is granted.

## STATEMENT OF UNDISPUTED FACTS

PartyLite manufactures and distributes candle products from its facility in Carol Stream,

Illinois. (Pl. 56.1 Resp. ¶¶ 1-2.)[1] In November 1998, at the age of 53, Mokry, an Hispanic woman

---

[1] Citations to "Plaintiff's Local Rule 56.1(b)(3)(B) Response to Defendant's Statement of Material Facts" has been abbreviated to "Pl. 56.1 Resp. ¶ __." Likewise, citations to "Defendant's Response to Plaintiff's Local Rule 56.1 Statement of Additional Facts" has been abbreviated to "Pl. 56.1 Resp. ¶ __."

The Court notes that the parties have failed to comply with L.R. 56.1. Accordingly, the parties forced the Court to wade through convoluted, noncompliant Local Rule 56.1 submissions. Nonconformity with the Local Rules and the

of Mexican descent, began working as a cycle counter in PartyLite's warehouse.  (Pl. 56.1 Resp. ¶ 6; Def. 56.1 Resp. ¶ 1.)  In that position, Mokry operates a machine with a lift, known as an "order picker," to navigate through aisles in the warehouse so that she can count products on the warehouse shelves.  (Pl. 56.1 Resp. ¶ 7.)  The only other cycle counter on her shift is Jose Tapia, a male employee of Mexican descent.  (Pl. 56.1 Resp. ¶ 73.)  Tapia turned 40 years old in 2006.  (*Id.*; Mokry Dep. at 73:7-8.)

Carlos Corcelles ("Corcelles") serves as the Director of Human Resources for PartyLite's Carol Stream facility and oversees all human resource functions.  (Def. 56.1 Resp. ¶ 2.)  He reports to Joe Salierno, Vice President of Worldwide Distribution.  (*Id.*)  When Mokry started working at PartyLite, she reported to Kim Lammlin.  (Def. 56.1 Resp. ¶ 24.)  Don Chapman ("Chapman"), Harry Campbell ("Campbell"), Frank Zabala ("Zabala") and Don Quinn ("Quinn") also supervised her work.  (Pl. 56.1 Resp. ¶ 68; Def. 56.1 Resp. ¶ 27; Mokry Dep. at 27:2.)

During the course of her employment at PartyLite, the company maintained a file named "Employee Warning/Discussion History for Cynthia Mokry" to document incidents and warnings

---

standing orders of the Court is not without consequence.  *Green v. Harrah's Illinois Corp.*, No. 03 C 2203, 2004 U.S. Dist. LEXIS 7569, at *8 (N.D. Ill. Apr. 29, 2004) (refusing to consider statements of fact in excess of the number permitted by Local Rule 56.1).  The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1."  *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) (citing *Bordelon v. Chicago School Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000)).  "A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed."  *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809-10 (7th Cir. 2005).  Accordingly, this Court will not consider portions of the parties' submissions that do not contain proper support from the parties' citations to the record.

Moreover, Plaintiffs' Combined Statement of Additional Facts contains inadmissible hearsay throughout the submission.  Therefore, even if Mokry had complied with L.R. 56.1, much of the evidence would have been inadmissible.  *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 534 (7th Cir. 2003) (noting that hearsay statements are not competent evidence that may be used to oppose a motion for summary judgment).  Accordingly, this Court will not consider portions of Plaintiffs' Combined Statement of Additional Facts that contain inadmissible hearsay.  *See Bradley v. Work*, 154 F.3d 704, 707-08 (7th Cir. 1998) (finding district court did not abuse its discretion by striking portions of L.R. 56.1 statement when the submissions did not conform with local rules and contained inadmissible hearsay).

that Mokry received. (Pl. 56.1 Resp. ¶ 14.) Since 1999, PartyLite has disciplined or spoken to Mokry regarding violations of PartyLite's safety, attendance, reporting and employee conduct policies sixteen times. (Pl. 56.1 Resp. ¶ 29.) For example, in 1999, PartyLite gave Mokry a written warning for violating safety rules when someone observed her lying on the dock floor taking pictures of one of her coworkers. (Pl. 56.1 Resp. ¶ 30.)

In 1999, Mokry was on vacation on the day that PartyLite issued paychecks to its employees, so she called Lammlin to make arrangements to pick up her check during a particular day. (Def. 56.1 Resp. ¶ 24; Mokry Dep. at 25:6-8.) Lammlin was the only employee that had access to the locked area that held the paychecks. (Mokry Dep. at 25:1-4.) When Mokry arrived at the office that day, Lammlin was in a meeting. (Mokry Dep. at 24:23.) Lammlin was angry with Mokry when she emerged from the meeting, so she retrieved the check from the locked area and threw it at Mokry. (Def. 56.1 Resp. ¶ 24; Mokry Dep. at 24:23.) Mokry had to pick the check up from the floor. (Def. 56.1 Resp. ¶ 24.) Although Mokry claims that Lammlin acted towards her in a derogatory fashion that day, she admits that Lammlin never said anything derogatory about Mokry's national origin, age, race or gender. (Def. 56.1 Resp. ¶ 24; Mokry Dep. at 36:12-17.)

On October 30, 2000, Mokry received a warning after someone observed her sleeping on the floor of a conference room during work hours. (Pl. 56.1 Resp. ¶ 30.) On February 6, 2003, while counting products on the warehouse shelves, Mokry wanted to count the cases of products located about five or six shelves high. (Def. 56.1 Resp. ¶ 27; Mokry Dep. at 46:19-24.) Based on the way that the cases were situated on the pallet, she thought that it would be unsafe for her to move the cases to conduct her count, so she asked some other warehouse workers to bring the pallet down. (Def. 56.1 Resp. ¶ 27; Mokry Dep. at 46:22-24, 47:1-5.) After they moved the pallet for her,

Campbell and Zabala yelled at her in front of the other employees, telling her to never ask the other workers to bring pallets down because they were too busy to take the pallets down for counting. (Def. 56.1 Resp. ¶ 28; Mokry Dep. at 47:6-12.) That same day, during her dinner break, Campbell and Zabala met with Mokry in a conference room to continue their discussion regarding lowering pallets for counting. (Def. 56.1 Resp. ¶ 29.) Mokry believes that Campbell and Zabala "came down hard on" her for having the pallet lowered but she admits that they never mentioned her national origin, race, age or gender when they yelled at her about the situation. (Def. 56.1 Resp. ¶¶ 28-29; Mokry Dep. at 48:12-14.)

On April 19, 2004, Mokry received a written warning after she punched in using her time card and then returned to the employee parking lot to sleep in her car. (Pl. 56.1 Resp. ¶¶ 28-29.) On May 14, 2004, Mokry applied for a position as a backup quality assurance technician. (Def. 56.1 Resp. ¶ 20; Mokry Dep. at 83:6-22; Mokry Dep. Ex. 18.) She admits that she had no prior experience or knowledge with respect to quality assurance, so she would have required training if she had received the promotion. (Mokry Dep. at 83:10-18.) At PartyLite, employees are ineligible for promotion if they have received a written warning within the past 60 days. (Pl. 56.1 Resp. ¶ 22.) Because she received the written warning for clocking in and sleeping in her car within 60 days of applying for the promotion, PartyLite determined that she was not eligible to apply for the backup quality assurance technician role. (*Id.*; Mokry Dep. Exs. 18, 19.) PartyLite filled the position with Joyce Ivy ("Ivy"), a non-Hispanic woman under the age of 40. (Def. 56.1 Resp. ¶ 20.)

In May 2005, Mokry applied for two vacant computer operator positions. (Def. 56.1 Resp. ¶ 21.) Mohammed Ameel ("Ameel"), a non-Hispanic male under the age of 40, also applied for one of the positions. (*Id.*) Both Ameel and Mokry required training in order to be qualified computer

operators. (*Id.*; Def. 56.1 Resp. ¶ 22.) Salierno interviewed Mokry for the positions on May 25, 2005 and determined that she was not qualified to be a computer operator. (Def. 56.1 Resp. ¶ 22; Mokry Dep. Ex. 17.) Ameel eventually received the first position. (Def. 56.1 Resp. ¶ 21.) A man named Thomas Mangin ("Mangin") received the second position. (Def. 56.1 Resp. ¶ 23; Mokry Dep. at 97:4-7.) The record contains no information regarding Mangin's age, race or national origin.

Mokry experienced a few problems with her order picker (described as a forklift) in the summer of 2005. Specifically, the lights were not as bright as she wanted them to be. (Def. 56.1 Resp. ¶ 25.) She asked Chapman to repair the lights, but he ignored her requests. (*Id.*) Chapman continued to ignore the lights until Mokry asked him to accompany her to the machine so he could see the condition of the lights for himself. (Mokry Dep. at 27:10-13.) Once he viewed the lights, he had them fixed for her. (Mokry Dep. at 27:15.)

Additionally, Mokry's order picker began to jerk when she drove it in early June 2005. (Def. 56.1 Resp. ¶ 15.) PartyLite employees have an obligation to report unsafe working conditions. (Def. 56.1 Resp. ¶ 11.) After experiencing difficulty with it for three days, she informed Chapman that the equipment jerked when she drove it. (Def. 56.1 Resp. ¶ 15; Mokry Dep. at 25:12-15.) Chapman responded that no one else had complained about that order picker and that he believed that there was nothing wrong with the machinery. (Mokry Dep. at 25:15-19.) Although Chapman did not have the order picker repaired immediately when Mokry complained, he did not say anything about her national origin, race, gender or age and he did not make derogatory comments towards her. (Mokry Dep. at 29:18-30:5.) Mokry continued to use the jerking order picker until she went to an emergency medical clinic because the jerking caused her discomfort in her back. (Mokry Dep. at 26:21-24.) When she told Salierno that she required medical treatment as a result of the jerking

order picker, he had the machine fixed.  (Mokry Dep. at 28:21-22.)  After investigating the incident, Human Resources Generalist Adrianne Harris ("Harris") proposed giving Mokry a warning for failing to report the faulty equipment fast enough, finding that Mokry "should have reported this problem immediately as required under [PartyLite's] safety guidelines" instead of waiting several days to report the situation to Chapman.  (Def. 56.1 Resp. ¶¶ 16, 31.)  Despite Harris' recommendation, Mokry did not receive a warning for not reporting the problem sooner.  (Mokry Dep. at 28; Mokry Dep. Ex. 6.)

On August 29, 2005, Mokry drove her order picker into a warehouse aisle already occupied by another order picker in violation of PartyLite's safety guidelines.  (Def. 56.1 Resp. ¶ 31; Corcelles Dep. Ex. 23.)  When the driver of the other order picker reversed the machine, the two order pickers collided.  (*Id.*)  Because of her involvement in the accident, PartyLite required her to submit to a post-accident drug test in September 2005.  (Pl. 56.1 Resp. ¶ 31.)  Mokry tested positive for Propoxyphene, a prescription pain killer marketed under the name Darvon.  (*Id.*)  Because the positive test result violated PartyLite's drug-free policy, the company suspended Mokry without pay and provided her with a "Last Chance Agreement" on September 14, 2005.  (Pl. 56.1 Resp. ¶¶ 31-32.)  The suspension and Last Chance Agreement constituted a final warning to Mokry.  (Pl. 56.1 Resp. ¶ 33.)  The record does not reflect the length of her unpaid suspension.

After Mokry returned from her suspension, in February 2006, she applied for two open positions: Warehouse Lead and Distribution Lead.  (Pl. 56.1 Resp. ¶ 44.)  Mokry applied for those positions within six months of receiving her final warning.  (Pl. 56.1 Resp. ¶ 45.)[2]  At PartyLite,

---

[2]  Mokry attempts to dispute whether she applied for the vacant positions within six months of receiving the final warning.  However, in her deposition, she admitted that she was not eligible for the promotions because she received the final warning within the six months preceding her applications:

Q:       [Y]ou were, in fact, ineligible for promotion to a lead position in February of 2006 because you

employees who have received a final warning within the previous six months are not eligible to receive promotions. (Pl. 56.1 Resp. ¶¶ 22, 46.) Mokry was ineligible for the promotions because she had received a final warning within the six months preceding her applications for the lead positions because she reached the Last Chance Agreement with PartyLite in September 2005. (*Id.*) She did not receive either of the Warehouse Lead or Distribution Lead positions. (*Id.*) She does not know the gender, race, national origin or age of the people who received the positions. (Pl. 56.1 Resp. ¶¶ 47-50.)

On March 13, 2006, Mokry wrote a note to Salierno to request a schedule change from the second shift to the first shift because she claims that workers in the "Yellow Zone" harassed her. (Pl. 56.1 Resp. ¶ 55; Mokry Dep. at 164; Mokry Dep. Ex. 11.) The Yellow Zone is a staging warehouse where employees work with pallets of PartyLite product. (Pl. 56.1 Resp. ¶ 55.) Other female and Hispanic employees worked in the Yellow Zone. (Pl. 56.1 Resp. ¶ 57.) Mokry spent every other week working in the Yellow Zone at PartyLite's Carol Stream facility. (Pl. 56.1 Resp. ¶ 56.) Her coworkers in the Yellow Zone frequently used swear words in violation of PartyLite policy. (Pl. 56.1 Resp. ¶ 58.) For example, on one occasion, Mokry entered the break room and saw a Yellow Zone worker named Roy swearing at a vending machine while he kicked it. (Pl. 56.1 Resp. ¶ 59.) She asked Roy to stop using profanity because she did not appreciate his improper language. (*Id.*) In response, Roy approached Mokry and asked her if she "want[ed] to make something out of this" until she said "I don't want to deal with this at this time." (Pl. 56.1 Resp. ¶

---

would have had a final warning within six months, right?

A: I will not disagree with you.

(Mokry Dep. at 102:19-23.)

60; Mokry Dep. at 175:11-15.) At that point, the confrontation with Roy ended. (Mokry Dep. at 175:16-21.)

Generally, the Yellow Zone workers used profanity in their conversations with each other; however, sometimes the workers directed their colorful language at Mokry. (Pl. 56.1 Resp. ¶ 62; Mokry Dep. at 174:6-11, 187:7-15.) Mokry only recalls one specific instance when a Yellow Zone worker directed profanity towards her. (Pl. 56.1 Resp. ¶ 62.) That time, an unidentified Yellow Zone leader called her some names in Spanish. (*Id.*) Mokry does not recall the context of the incident or what the leader called her. (*Id.*) In addition to that incident, Yellow Zone workers gossiped about her and laughed at her. (Mokry Dep. at 171-72.) On one occasion, an unidentified person vandalized her personal vehicle in the employee parking lot. (Mokry Dep. at 173.) Sometimes Yellow Zone workers kept their order pickers in a particular aisle in the warehouse and would not move when Mokry asked them to get out of her way. (Pl. 56.1 Resp. ¶¶ 65, 67.) Those workers held different positions at PartyLite than Mokry did and their positions had priority over her position when it came to occupying space in the warehouse aisles. (Pl. 56.1 Resp. ¶ 66.)

Mokry reported the behavior of the Yellow Zone employees to Dean and Salierno. (Pl. 56.1 Resp. ¶ 68.) Salierno asked for the names of the workers at issue and told Mokry that he would take care of the situation. (Pl. 56.1 Resp. ¶ 69.) Dean and Salierno then spoke to the Yellow Zone workers as a group. (Pl. 56.1 Resp. ¶ 70.) Because Mokry was not present for this discussion, she does not know what Dean and Salierno said or did as a result of her complaint. (*Id.*) However, PartyLite eventually fired the workers that Mokry complained about before she filed this lawsuit. (Pl. 56.1 Resp. ¶ 71.)

On March 23, 2006, Mokry tripped and sprained her knee. (Corcelles Dep. Ex. 23.) On March 30, 2006, one of Mokry's coworkers informed her that Harris and Chapman wanted to meet with her that afternoon in Chapman's office in PartyLite's East Tower. (Mokry Dep. at 106:5-7.) When she learned of the meeting, Mokry was in PartyLite's West Tower. (*Id.*) Although she had been cleared to return to work with no restrictions regarding her knee, she wanted to "take it easy with [her] knee," so she asked Patrick Dean ("Dean"), a supervisor who used a company-issued golf cart to travel between the two towers, to give her a ride to the meeting. (Mokry Dep. at 106:21-107:1.) Dean agreed to give her a ride after he finished his meeting in the West Tower. (Mokry Dep. at 107:2-5.) Mokry waited for Dean to give her a ride but his meeting lasted longer than she expected. (Mokry Dep. at 107:6-7.) Meanwhile, Harris and Chapman waited inside Chapman's office for Mokry's arrival. (Mokry Dep. Exs. 4, 5.) Harris and Chapman expected Mokry to arrive at 3:30 p.m. for the meeting but she came 40 minutes late. (Pl. 56.1 Resp. ¶ 34.) Mokry's tardiness made her supervisors unhappy. (Pl. 56.1 Resp. ¶ 39.) When Mokry explained that she was late for the meeting because she had been waiting for a ride from Dean on the golf cart, Harris and Chapman told her that PartyLite does not operate a taxi or shuttle service and that she had no right to ask Dean for a ride. (Pl. 56.1 Resp. ¶¶ 38-39; Mokry Dep. 108:7-9.) During the meeting, Mokry became upset and raised her voice at the supervisors. (Pl. 56.1 Resp. ¶ 35.) Mokry received a suspension for two or three days as a result of her conduct during the meeting. (Pl. 56.1 Resp. ¶ 37.)[3] Although

---

[3] Mokry attempts to dispute this statement, claiming that she received her suspension for "refusing to work." (Pl. 56.1 Resp. ¶ 37 (citing Mokry Dep. at 109-112).) In the cited portion of Mokry's deposition, Mokry testified that after her suspension, an unidentified individual told her that she received the suspension for refusing to work. (Mokry Dep. at 111:24-112:20.) Mokry denies that she ever refused to work. (*Id.*) At the summary judgment stage, parties must produce admissible evidence. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1267-68 (7th Cir. 1994). Mokry's assertion that PartyLite suspended her for refusing to work is inadmissible hearsay. *See* Fed. R. Evid. 801 (defining hearsay as an out of court statement offered to prove the truth of the matter asserted). Because Mokry has not controverted PartyLite's asserted reason for her suspension on March 30, 2006 with admissible evidence, she is deemed to admit that she received her suspension based upon her conduct during the meeting. *See*

Harris and Chapman made no mention of Mokry's national origin, race, gender or age during the meeting, Mokry believes that she received the suspension because of those reasons. (Pl. 56.1 Resp. ¶ 40; Mokry Dep. at 116:8-14.) Mokry concedes that the supervisors at the meeting would have been upset if any other employee had arrived to a meeting late. (Pl. 56.1 Resp. ¶ 41.)[4]

Mokry filed her charge of discrimination on May 22, 2006. (Pl. 56.1 Resp. ¶¶ 26, 75.) She admits that she has not experienced any discrimination or retaliation since she filed the charge of discrimination. (Pl. 56.1 Resp. ¶ 75.) In fact, her "life became better once [she] filed this case." (Pl. 56.1 Resp. ¶ 76.) She also concedes that nobody at PartyLite told her that she might lose her job or suffer an adverse employment action if she filed a charge of discrimination. (Pl. 56.1 Resp. ¶ 77.) On February 20, 2007, Mokry filed this action alleging ten counts of discrimination under Title VII, the ADEA and § 1981. (Compl.)

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477

---

L.R. 56.1(b)(3)(C).

[4] While Mokry attempts to controvert this statement, in her deposition, she admitted that the supervisors would have been upset if any other employee came to the meeting late:

    Q:     As far as you know, [the supervisors] would have treated – Anybody else who showed up late to a meeting they would have been upset with, right?

    A:     They would have been upset.

(Mokry Dep. at 118:23-119:3.)

U.S. 242, 255 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

## DISCUSSION

I.      PartyLite's Motion to Strike Mokry's Declaration

In conjunction with her Response to PartyLite's Motion for Summary Judgment, Mokry submitted the Declaration of Cynthia Mokry as Exhibit A. The document begins "I, Cynthia Mokry, state the following under oath or affirmation . . . ." (Mokry Decl. at 1.) On the third page of the document, only Mokry's signature appears. (Mokry Decl. at 3.) The document is not notarized and it does not state that the statements within the declaration are true and correct under penalty of perjury. PartyLite has moved the Court to strike the affidavit based on those deficiencies.

The party opposing summary judgment must submit affidavits or other competent evidence to demonstrate a genuine issue of material fact. *See* Fed. R. Civ. P. 56(e). "An affidavit is a statement reduced to writing and the truth of which is sworn to before someone who is authorized to administer an oath." *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). Courts will excuse the

failure to comply with the formal requirements of a jurat if the declarant actually swore to the statements before an officer authorized to administer an oath. *See id.* For example, in *Pfeil*, the affidavits at issue stated that "[The Affiant, first being duly sworn on oath deposes and states . . . ." *Id.* at 858. The affidavits bore the signatures of the affiants and the notary public wrote "Subscribed and sworn to me before this 19th day of November, 1982. Gerald T. Flynn. Notary Public, Racine County, Wis. My commission is permanent." *Id.* at 858-59. The notary did not emboss the documents with his official seal, however. *See id.* at 859. The absence of the seal did not render the affidavits inadmissible because the affidavits indicated that the affiants actually swore to the statements before an officer authorized to administer an oath. *See id.* In lieu of affidavits that satisfy the oath requirement, a party may properly submit unsworn documents made under penalty of perjury and verified as true and correct. *See* 28 U.S.C. § 1746; *DeBruyne v. Equitiable Life Assurance Society of the United States*, 920 F.2d 457, 471 (7th Cir. 1990) ("[T]he 'affidavit' which did not subject [the declarant] to the penalties for perjury was not within the range of evidence that the district court could consider."). District courts have the discretion to disregard affidavits that are neither notarized nor made under the penalty of perjury. *See Gilty v. Vill. of Oak Park*, 919 F.2d 1247, 1255 n.13 (7th Cir. 1990).

Here, Mokry's declaration does not indicate whether Mokry swore to the truth of her statement to someone authorized to administer an oath. Although Mokry's declaration states that she made the declaration "under oath or affirmation," the document does not indicate who, if anyone, administered the oath to her and it does not bear the signature of a notary or a witness. Unlike the affidavits at issue in *Pfeil*, Mokry's declaration does not suggest that Mokry actually swore to the truth of her declaration to anyone, let alone someone authorized to administer an oath.

Therefore, her declaration does not satisfy the requirements of an affidavit. Additionally, because she did not verify that her declaration was true and correct under penalty of perjury, the declaration does not satisfy the requirements for admitting an unsworn declaration under 28 U.S.C. § 1746. Accordingly, the Court strikes the Declaration of Cynthia Mokry, attached as Exhibit A to her materials submitted in opposition to PartyLite's Motion for Summary Judgment. Of course, the ruling on Mokry's affidavit does not impact her 287 page deposition, which was considered by the Court in reaching its ruling on PartyLite's motion.

## II.     Statute of Limitations

As a preliminary matter, Mokry claims that PartyLite failed to promote her and took various disciplinary actions against her over a long period of time because of her race, national origin, gender and age. To the extent that she brings claims under Title VII and the ADEA, a claim of discrimination is time-barred if the plaintiff does not file a charge of discrimination within 300 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B). With respect to claims regarding discrete employment actions, such as disciplinary actions and the failure to promote, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also Roney v. Ill. Dep't of Transp.*, 474 F.3d 455, 460 (7th Cir. 2007) (A discrete act of discrimination "is an unlawful employment practice that must be brought to the EEOC's attention within 300 days of its occurrence.")

Here, Mokry filed her charge of discrimination with the EEOC on May 22, 2006. Therefore, any discrete acts that occurred before July 26, 2005 cannot provide the basis of her Title VII or ADEA claims because they are time-barred. In her opposition to PartyLite's Motion for Summary

13

Judgment, Mokry made no argument that any of her claims arising from disciplinary actions or missed promotions before July 26, 2005 are timely under Title VII or the ADEA. The only actions that occurred within the 300 days preceding her charge of discrimination are: 1) the suspension for failing the post-accident drug test in September 2005; 2) the failure to promote Mokry to lead positions after she applied for two of them in February 2006; and 3) the March 2006 suspension that she received after raised her voice at her supervisors when they asked her why she arrived to the meeting late. Because all other instances where PartyLite disciplined Mokry or chose to not promote her occurred more than 300 days before she filed her charge of discrimination with the EEOC, they cannot provide the basis for her Title VII and ADEA claims. Accordingly, the Court will limit its analysis of Mokry's Title VII and ADEA claims to the three discrete acts that occurred after July 26, 2005.

With respect to Mokry's claim under 42 U.S.C. § 1981, a four year statute of limitations applies to claims of racial discrimination in the employment context. *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383-84 (2004). Unlike Title VII and ADA claims, actions arising under § 1981 do not require plaintiffs to exhaust administrative remedies before bringing suit in federal court. *See Walker v. Abbott Labs.*, 340 F.3d 471, 474 (7th Cir. 2003). Because Mokry filed suit on May 9, 2007, instances of missed promotions and discipline occurring before May 9, 2003 are time-barred and cannot provide the basis for her § 1981 claim. The discrete employment actions that occurred within four years of Mokry's Complaint in this actions are: 1) PartyLite issued a written warning to Mokry on April 19, 2004 after she clocked in and returned to her car to sleep; 2) Mokry did not receive a promotion to the quality assurance technician position on May 14, 2004; 3) Mokry did not receive two computer operator positions that she applied for in May 2005; 4) Harris

14

proposed giving Mokry a warning for failing to report the jerking in her order picker sooner in June 2005; 5) Mokry received a suspension and final warning in September 2005 when she tested positive for prescription pain killers after her involvement in a workplace accident; 6) Mokry received a suspension after arriving late to a meeting with her supervisors and engaging in an argument with them in March 2006.

III.    Retaliation Claims

In Counts I, IV, VIII, IX and X, Mokry claims that PartyLite violated Title VII and the ADEA by retaliating against her after she filed her charge of discrimination and filed this lawsuit. The same standard governs retaliation claims brought under Title VII and the ADEA. *See Flannery v. Recording Indus. Ass'n of Am.*, 345 F.3d 632, 642 (7th Cir. 2004). An employer may not take adverse employment actions against employees because they engaged in a statutorily protected activity, such as filing a charge of discrimination or a lawsuit alleging unlawful discrimination. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 850 (7th Cir. 2008). Here, Mokry concedes that she has not experienced any discrimination or retaliation since she filed her charge of discrimination on May 22, 2006. (Pl. 56.1 Resp. ¶ 75.) She also admits that nobody at PartyLite told her that she might lose her job or suffer an adverse employment action if she filed a charge of discrimination. Based on Mokry's admission that she has not suffered an adverse employment action after she engaged in statutorily protected activity, PartyLite is entitled to judgment as a matter of law with respect to Mokry's retaliation claims.

IV.    Title VII and ADEA Discrimination

Title VII prohibits employment discrimination on the basis of an employee's gender, race, religion or national origin. *See* 42 U.S.C. § 2000e *et seq.* Similarly, the ADEA prohibits

employment discrimination against employees over 40 years old. *See* 29 U.S.C. § 621 *et seq*. In Counts I, IV and VI, Mokry claims that PartyLite violated Title VII and the ADEA by discriminating against her on the basis of her race, national origin, gender and age when it disciplined her and failed to promote her on various occasions. The prima facie elements of discrimination are the same under Title VII and the ADEA. *See Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008). Plaintiffs may show discrimination by utilizing either the direct or indirect methods of proof. *See id.*          A.          Direct Method of Proof

A plaintiff may establish unlawful discrimination under the direct method by presenting direct or circumstantial evidence that creates a "convincing mosaic of discrimination." *See Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009). Direct evidence of discrimination essentially consists of an admission that the employer that it took an adverse employment action against an employee based upon prohibited animus. *See Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Circumstantial evidence of intentional discrimination can consist of suspicious timing, ambiguous statements, differing treatment of similarly situated employees, personal animus, pretext and other evidence which allows the jury to reasonably infer retaliation. *See Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 812 (7th Cir. 2007)). To survive summary judgment, the plaintiff must present evidence of a link between her protected status and the adverse employment action. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003) ("Bigotry, per se, is not actionable. It is actionable only if it results in injury to a plaintiff; *there must be a real link between the bigotry and an adverse employment action*.") (emphasis added) (citation omitted).

Here, Mokry concedes that no direct evidence of intentional discrimination based on her race, national origin, gender or age exists. Nonetheless, she claims that a jury could infer discriminatory animus from PartyLite's handling of her jerking order picker in June 2005 and from her suspension in March 2006. With respect to each instance, Mokry admits that no one from PartyLite made any remarks regarding her race, national origin, gender or age. Additionally, she puts forth no evidence to link her treatment on those two occasions with her protected characteristics. For example, while PartyLite may have incorrectly handled repairing her order picker when it was jerking, nothing in the record supports her assertion that PartyLite failed to respond to her requests to fix it because of her race, national origin, gender or age. Mokry only offers evidence that she belongs to a protected class and that PartyLite only fixed her order picker after she suffered an injury from using it. While she asserts that PartyLite ignored her requests to fix the machine because of her race, national origin, gender or age, a plaintiff's bare assertion that an employer mistreated her because of her protected status is not sufficient to establish a link between the protected status and the treatment she received. *See Winsley*, 563 F.3d at 605 (citing *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.")). Without evidence that some link exists between her protected status and PartyLite's failure to repair the jerking order picker, a reasonable jury could not infer that PartyLite intentionally discriminated against her in that instance based upon her race, national origin, gender or age.

Similarly, Mokry claims that Harris found that Mokry should have reported the problem with her machinery sooner than three days after she discovered the problem only because of Mokry's race, national origin, gender or age. The Court notes that even though Harris recommended

17

that PartyLite issue Mokry a warning for failure to report the defective order picker immediately when she discovered the unsafe condition, Mokry did not receive a warning or any disciplinary action as a result of the incident.  Additionally, nothing in the record aside from Mokry's own speculation links Harris' recommendation with Mokry's protected status.  The parties agree that PartyLite employees have an obligation under PartyLite's safety policies to report unsafe conditions and that Mokry did not report the jerking order picker  for three days.  The record contains no evidence that Harris made her recommendation to selectively enforce the guideline against Mokry.  Furthermore, even assuming that Harris selectively enforced the guideline against Mokry, the record contains no evidence to suggest that Harris recommended that Mokry receive a warning for the incident because of her protected status.  In any event, Mokry did not receive a warning for failing to report her jerking order picker when she first became aware of the unsafe condition.

Mokry also claims that she received a suspension in March 2006 because of her race, national origin, gender or age.  Again, she provides no evidence to create a bridge between her protected status and the suspension.  Mokry admits that her supervisors believed that she arrived to the meeting forty minutes late because she chose to wait until Dean could give her a ride to the meeting on his golf cart.  When she arrived, she claims that Harris and Chapman spoke to her as if she were a child, belittling, ridiculing and embarrassing her before she became angry and raised her voice at her supervisors.  She received a two or three day suspension because of her actions at the meeting.  At no time during the meeting did Harris or Chapman make reference to Mokry's race, national origin, gender or age.  Mokry concedes that her supervisors would have become upset with any employee who arrived to a meeting forty minutes late.  The only evidence in the record to provide a link between her protected status and her suspension is her belief that the supervisors treated her as a child and suspended her solely because of her race, national origin, gender or age.

However, her bare assertion that Harris and Chapman suspended her based upon an impermissible animus is not sufficient to permit an inference of illegal discrimination.

Because Mokry has not provided admissible direct or circumstantial evidence of discrimination based upon her race, national origin, gender or age, she has failed to meet her burden of establishing a prima facie case of illegal discrimination under the direct method of proof.

B.    Indirect Method

Mokry claims that PartyLite took the following employment actions against her based upon illegal animus: 1) it issued her a final warning and suspended her after she tested position for prescription pain killers after an accident in the workplace; 2) PartyLite did not promote her to either of the two lead positions that she applied for in February 2006; and 3) the company suspended her in March 2006 after she arrived to a meeting late, became angry with her supervisors and raised her voice at them.  The Court will address her failure to promote and disciplinary action claims separately.

i.    Failure to Promote

Under the indirect method of proof, a plaintiff may establish a prima facie case of discrimination in a failure to promote case by presenting evidence that: 1) she is a member of a protected class; 2) she was qualified and applied for the position; 3) she did not receive the position; and 4) the employer gave the position to a similarly situated person outside of the protected class who was similarly or less qualified than she.  *See Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008).  Once a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  *See Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009).  If the employer satisfies that burden, to avoid summary

judgment, the plaintiff must establish that there is an issue of material fact as to whether the employer's proffered reasons are mere pretext for unlawful discrimination. *See id.*

In February 2006, Mokry applied for two lead positions within PartyLite's warehouse: Warehouse Lead and Distribution Lead. The record contains no evidence of Mokry's qualifications for the position. Additionally, the record does not identify who actually received the lead positions or their the races, national origins, genders or ages. Most critically, the record contains no evidence of the qualifications of the people who received the positions, preventing the Court from determining if the people who became leads were similarly or less qualified than Mokry. Because Mokry has not demonstrated that she was qualified for the open lead positions or that the positions went to someone outside of her protected class, she has failed to meet her burden for establishing a prima facie case of discriminatory failure to promote.

The Court notes that even if Mokry had established a prima facie case of dicrimination, PartyLite has articulated a legitimate, non-discriminatory reason to explain why Mokry did not receive the lead positions. Mokry received a final warning in September 2006 after she tested positive for prescription pain killers in violation of PartyLite policy. Because Mokry had received a final warning from PartyLite in the six months preceding her applications for the lead positions, under PartyLite policy, she was not eligible to receive a promotion in February 2006. Mokry has conceded that she was not eligible to receive a promotion in February 2006 and has presented no evidence that PartyLite's stated reason for not promoting her to a lead position was a mere pretext for discrimination. Regardless, Mokry has failed to establish a prima facie case of discrimination.

ii.      Disciplinary Actions Against Mokry

In discrimination cases based on adverse employment actions other than the failure to promote, a plaintiff may establish a prima facie case by establishing that: 1) she is a member of a

protected class; 2) her job performance met her employer's legitimate business expectations; 3) she was subject to a materially adverse employment action; and 4) the employer treated similarly situated employees outside of the protected class more favorably. *See Winsley*, 563 F.3d at 604. Once a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See Antonetti*, 563 F.3d at 591. If the employer satisfies that burden, to avoid summary judgment, the plaintiff must establish that there is an issue of material fact as to whether the employer's proffered reasons are mere pretext for unlawful discrimination. *See id.*

A similarly situated employee is "directly comparable to [the plaintiff] in all material respects." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). In discrimination cases arising out of disciplinary actions, plaintiffs must show "that two employees dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams*, 324 F.3d at 940.

Here, Mokry claims that she received two suspensions because of her race, national origin, gender or age. In September 2005, she received an unpaid suspension and a final warning when she tested positive for prescription pain killers after she collided with another order picker in PartyLite's warehouse. In March 2006, she received a suspension when she arrived late to a meeting with Harris and Chapman and then became angry and raised her voice at the supervisors when they questioned her about her late arrival. She claims that Tapia is a similarly situated employee because they each held the same position at PartyLite. Although Mokry and Tapia are both cycle counters at PartyLite, there is no evidence in the record that Tapia, or any other PartyLite employee, engaged in conduct similar to Mokry's. Mokry points to no evidence that any other employee received

different treatment after testing positive for medication following a collision in violation of PartyLite's drug policy. Similarly, no evidence exists to suggest that any other employee arrived 40 minutes late to a meeting with his or her supervisors and then spoke to the supervisors with a raised voice during the course of the meeting. In fact, the record makes no mention of any other PatyLite employee who ever violated PartyLite's drug use policy, arrived late to a meeting with supervisors or spoke to his or her supervisors with a raised voice. Because Mokry presents no evidence that Tapia or any other employee engaged in similar conduct to hers but received disparate treatment, she has failed to establish a prima facie case that engaged in illegal discrimination when it disciplined her.

Additionally, Mokry claims that PartyLite discriminated against her on the basis of her race, national origin, gender and age when Chapman did not repair her jerking order picker after she reported it and when Harris recommended that Mokry receive a warning for not reporting the unsafe condition of the machinery sooner. Despite Harris' recommendation, Mokry did not receive a warning or any discipline as a result of her failure to immediately report her jerky order picker. An actionable adverse employment actions is a significant change in the employee's employment status. *See Lewis v. City of Chicago*, 496 F.3d 645, 653 (7th Cir. 2007). Examples of actionable adverse employment actions include termination, failure to promote or reassignment with significantly different responsibilities. *See id.* Negative performance evaluations and reprimands from an employer, standing alone, do not constitute adverse employment actions; they only become actionable when the reprimand is coupled with a tangible job consequence. *See Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004). Mokry presents no evidence of a tangible job consequence as a result of Harris' recommendation to issue Mokry a warning. In fact, Mokry did not even receive a warning as a result of the incident. The record does not suggest that anything

about Mokry's job changed after Harris' recommendation. Accordingly, Mokry has failed to present evidence that she suffered an adverse employment action as a result of the jerking order picker incident.

Because Mokry has failed to establish a prima facie case of discrimination under Title VII or the ADEA, PartyLite is entitled to judgment as a matter of law with respect to her discrimination claims in Counts I, IV and VI.

V.      Section 1981 Racial Discrimination

In Count III, Mokry claims that PartyLite violated 42 U.S.C. § 1981 by discriminating against her on the basis of her race. Under § 1981, "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. The phrase "make and enforce contracts" prohibits racial discrimination in the employment context, including harassment, discharge, promotion, transfer, retaliation and hiring. *See Jones*, 541 U.S. at 383. In analyzing § 1981 claims, courts apply the same standards as in Title VII cases. *See Thanogsinh v. Board of Educ.*, 462 F.3d 762, 782 (7th Cir. 2006). As in the Title VII context, plaintiffs may proceed under the direct or indirect methods of proof. *See Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009). Because Title VII and § 1981 claims use the same standards, a plaintiff's failure to establish a prima facie case of discrimination under Title VII for a given employment action necessarily forecloses a § 1981 claim arising from the same action. *See Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996).

Mokry claims that PartyLite violated § 1981 by discriminating against her on the basis of her race when: 1) Mokry received a written warning on April 19, 2004 for sleeping in her car after clocking in; 2) Mokry did not receive a promotion to a quality assurance technician position in May 2004; 3) Mokry did not receive a promotion to a computer operator position in February 2005; 4)

Harris recommended that PartyLite issue Mokry a warning for failing to report her jerking order picker immediately in June 2005; 5) PartyLite suspended her in March 2006 after she arrived late to the meeting with Harris and Chapman, became angry with them when she arrived and spoke to them with a raised voice; and 6) Mokry did not receive a promotion to a lead position in February 2006. Because the Court has determined that Mokry has not established a prima facie case of discrimination under Title VII with respect to the incidents in June 2005, March 2006 and February 2006, her § 1981 claims based upon those same actions must fail. Accordingly, the Court limits its analysis of her § 1981 claims to the April 2004 warning and the missed promotions in May 2004 and February 2005. With respect to those events, Mokry does not attempt to proceed under the direct method of proof.

Under the indirect method of proof, to establish a prima facie case that PartyLite discriminated against Mokry on the basis of her race when it issued her a warning in April 2004, she must submit evidence that: 1) she is a member of a protected class; 2) her job performance met her employer's legitimate business expectations; 3) she was subject to a materially adverse employment action; and 4) the employer treated similarly situated employees outside of the protected class more favorably. *See Winsley*, 563 F.3d at 604. To establish a similarly situated employee, she must show that she and another employee each "dealt with the same supervisor, were subject to the same workplace rules, and engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams*, 324 F.3d at 940.

Here, Mokry has not attempted to identify another employee that fell asleep on the job and received less of a reprimand than she did. The only employee that she identifies as being similarly situated to her is Tapia, but the record does not suggest that he ever violated PartyLite policy, let alone that he violated it in the same way that Mokry did when she punched in using her timecard

24

and then returned to her car to sleep in April 2004. Additionally, even if the record did establish that Tapia received more favorable treatment than Mokry after he engaged in similar misconduct, that evidence would not satisfy her burden of identifying a similarly situated employee *outside of her protected class* because Mokry and Tapia are each Hispanic and belong to the same race. Because she has not identified a similarly situated employee outside of her protected class who received more favorable treatment from PartyLite, with respect to the warning she received in April 2004, Mokry has failed to establish a prima facie case of racial discrimination.

Mokry also claims that PartyLite failed to promote her on three occasions because of her race. As in the Title VII context, a prima facie case of racial discrimination, consists of evidence that: 1) the plaintiff is a member of a protected class; 2) she was qualified and applied for the position; 3) she did not receive the position; and 4) the employer gave the position to a similarly situated person outside of the protected class who was similarly or less qualified than she. *See Jackson*, 552 F.3d at 622. To establish that the person who received the promotion was similarly situated at the time of the alleged discrimination, a plaintiff must demonstrate that the other person occupied the same job level and engaged in similar conduct before the decision. *See Jordan v. City of Gary, Ind.*, 396 F.3d 825, 834 (7th Cir. 2005) (holding that person outside of protected class was not similarly to plaintiff when plaintiff "had an extensive track record of repeated and ongoing prior problems" and the record contained no evidence to "suggest that [the person who received the promotion] had *ever* committed a work rules violation or even a breach of protocol . . .") (emphasis in original).

On May 14, 2004, Mokry applied for the position of backup quality assurance technician. She admits that she had no prior experience or knowledge with respect to quality assurance before she applied. Therefore, she has not established that she met the requirements for the job.

Ultimately, PartyLite gave the position to Ivy, a non-Hispanic woman. The record makes no reference to the requirements for a backup quality assurance technician or of Ivy's qualifications for the job. While Mokry has identified someone from outside of her protected class that received the promotion over her, she has not presented any evidence that Ivy was less qualified than her. Therefore, Mokry has failed to establish a prima facie case racial discrimination caused PartyLite to award the backup quality assurance technician to Ivy instead of her. Additionally, even if she had established a prima facie case of racial discrimination, PartyLite has offered a race-neutral explanation for its decision to not promote Mokry. PartyLite employees who have received a written warning are ineligible for promotions during the 60 day period following the written warning. Because Mokry received a written warning on April 19, 2004 for clocking in and returning to the parking lot to sleep in her car, she was not eligible to receive a promotion on May 14, 2004, the date that she applied for the backup quality assurance technician job. Regardless, Mokry has failed to establish a prima facie case of racial discrimination with respect to PartyLite's failure to promote her to the role of backup quality assurance technician.

In May 2005, Mokry applied for two available computer operator positions but two men received the positions. Ameel, a non-Hispanic male, received the first position and Mangin received the second position. Mokry has provided little to no evidence regarding her qualifications to be a computer operator. For example, the record does not contain the job description, requirements, or evidence of Mokry's qualifications to be a computer operator. Mokry fails to provide any evidence of her familiarity with PartyLite's computer system or the extent of her prior experience with computers. The only evidence relating to her and Ameel's qualifications is Mokry's statement that both her and Ameel would require training before they could be computer operators. Critically absent from the record is any evidence of Ameel's role before he received the computer operator

position, previous positions that he held throughout his career, his familiarity with computer systems, including the system that PartyLite operated or the amount of training that he would need to become a computer operator.

With respect to Mangin, the record only makes one reference to him, indicating that he received the second computer operator position. The record is silent with respect to his qualifications to be a computer operator at PartyLite, his knowledge of computer systems and his prior employment experience. Mokry has not even provided evidence of Mangin's race. Additionally, as in *Jordan*, the record reflects that PartyLite disciplined Mokry on numerous occasions for breaching various policies and protocols but it contains no evidence to suggest that Ameel or Mangin ever committed a workplace violation. Accordingly, Mokry has not established that she was similarly situated to either Ameel or Mangin when they received the promotions over her. Because Mokry has not established that she was qualified for the vacant computer operator positions and because she has not established that either Ameel or Mangin were similarly situated to her or that they were less qualified than her for the positions, she has not met her burden of establishing a prima facie case that PartyLite discriminated against her based upon illegal animus when it did not promote her to the computer operator positions.

In February 2006, Mokry applied for two open lead positions within PartyLite's warehouse: Warehouse Lead and Distribution Lead. She has provided no evidence regarding her qualifications for the job. Nothing in the record describes the roles that warehouse and distribution leads perform within PartyLite's operations, the requirements for a person to become a lead or whether Mokry had the necessary skills to become a lead. Therefore, Mokry has not satisfied her burden of presenting evidence that she as qualified for the lead positions that she did not receive. Additionally, she has not identified that the lead positions went to similarly or less qualified employees outside of her

27

racial group. Mokry did not receive either position but she does not know the races of the people who received the lead roles. In fact, she has not even identified the people who became leads instead of her. Therefore, she has not carried her burden of offering evidence that the lead positions went to similarly or less qualified employees outside of her racial group. Furthermore, even if she had established a prima facie case of racial discrimination with respect to the lead positions that she did not receive, PartyLite has offered a race-neutral explanation for its decision to not hire Mokry. Because she made her Last Chance Agreement with PartyLite in September 2005 after she tested positive for pain killers following her order picker accident in the warehouse, she had received a final warning within the six months preceding February 2006, when she applied for the lead positions. However, PartyLite employees who receive a final warning are not eligible to receive promotions in the six months following the final warning. Therefore, PartyLite asserts that it did not promote Mokry to a lead position because she was not eligible for a promotion at the time that she applied. In response, Mokry offers no evidence that PartyLite's race-neutral explanation is a mere pretext for racial discrimination. In fact, Mokry concedes that she was not eligible to receive a promotion in February 2006. Regardless, she has failed to establish a prima facie case of racial discrimination with respect to PartyLite's failure to promote her to a lead position in February 2006.

Because Mokry has failed to establish a prima facie case that PartyLite took disciplinary actions against her and failed to promote her because of her race, PartyLite is entitled to summary judgment with respect to Count III.

VI.    Title VII and ADEA Harassment/Hostile Work Environment

In Counts I, II, IV, V and VII, Mokry claims that PartyLite subjected her to a hostile work environment based upon her race, national origin, gender and age. Employers violate Title VII or the ADEA if discrimination based upon race, national origin, gender or age creates a hostile or

abusive work environment. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1033 (7th Cir. 2003). To establish a hostile work environment, the plaintiff must submit evidence that: 1) she was subject to unwelcome harassment; 2) the harassment was based upon a protected characteristic; 3) the harassment was severe and pervasive so as to alter the conditions of the employee's environment and creates a hostile work environment; and 4) a basis for employer liability exists. *See Atanus*, 520 F.3d at 676.

In order to maintain a claim for hostile work environment under Title VII or the ADEA, the plaintiff must offer evidence that a supervisor or coworker harassed her because of a protected characteristic, such as her race, national origin, gender or age. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004). Federal civil rights laws do not exist to ensure that employees enjoy workplaces that are free from profanity or incivility; to be actionable, the conduct must either have a discriminatory character or purpose. *See Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345 (7th Cir. 1999); *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1010 (7th Cir. 1994) ("Workers, like other people, often are foul-mouthed, and while there are still people in this country, male as well as female, who are deeply offended by dirty words, employers are not under a legal duty enforceable by suits under Title VII to purify the language of the workplace."); *Vore v. Ind. Bell Tel. Co., Inc.*, 32 F.3d 1161, 1162 (7th Cir. 1994) (noting that Title VII "does not guarantee a utopian workplace, or even a pleasant one.").

Here, Mokry claims that PartyLite's Yellow Zone constituted a hostile work environment for her. She claims that Yellow Zone employees frequently used swear words, refused to yield to her in the warehouse and vandalized her personal car on one occasion. She concedes that the workers in the Yellow Zone generally used foul language in their conversations with each other and she provides no specific examples of situations where employees directed foul language at her

because of her race, national origin, gender or age. During the two times that Yellow Zone workers directed profanity at her, there is no evidence that the employees singled her out because of her protected characteristics. For example, when she approached Roy in the break room while he was kicking a vending machine and swearing at it, she asked him to stop because his language offended her. Roy became agitated with her and confronted Mokry before she backed away from the situation. There is no evidence in the record to support the inference that Roy confronted her because of her race, national origin, gender or age. In fact, when he confronted her, he did not make reference to any of her protected characteristics; rather, he only asked her if she "wanted to make something out of this," indicating that he did not appreciate Mokry's attempt to clean up his language.

The only other time that Mokry recalls a Yellow Zone employee using profanity towards her, a Yellow Zone leader called her some names in Spanish. She does not recall what names the leader called her or the context of the incident and she makes no claim that the leader's comment referenced her race, national origin, gender or age. While Mokry found the situation unpleasant, she has offered no evidence that the leader called her a name because of her protected characteristics.

With respect to the vandalization of her car and the failure of Yellow Zone employees to yield to her in the warehouse aisles, Mokry again offers no admissible evidence to link those incidents with her race, national origin, gender or age. The Yellow Zone employees could have vandalized her car for a variety of reasons, such as personal animosity, or belief that she did not pull her share of the weight in the warehouse. They even could have vandalized her car accidentally, intending to vandalize someone else's. While Mokry claims that they did it because of race, national origin, gender or age, she offers no evidence to support her speculation about their motives. Similarly, she offers no evidence that Yellow Zone workers failed to yield to her in the warehouse

aisles because of her protected characteristics.[5]  In fact, she concedes that because she held a different position than the other employees, they had priority over her when it came to occupying space in the warehouse's aisles.  Nothing in the record links their refusals to move out of her way to her race, national origin, gender or age.

Because Mokry has failed to submit evidence that Yellow Zone workers harassed her because of her protected characteristics, PartyLite is entitled to judgment as a matter of law with respect to Mokry's hostile work environment claims in Counts I, II, IV, V and VII.

## CONCLUSION AND ORDER

For the reasons stated, PartyLite's Motion for Summary Judgment is granted.

So ordered.

Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date:   August 20, 2009

---

[5]  Mokry's failure to offer evidence in support of her claims is a recurring theme in this case.  The Court notes that Mokry only conducted one deposition in this matter, the deposition of Corcelles, a Rule 30(b)(6) witness.